Todd M. Friedman (SBN 216752)
Adrian R. Bacon (SBN 280332)
LAW OFFICES OF TODD M. FRIEDMAN, P.C.
21031 Ventura Blvd., Suite 340
Woodland Hills, CA 91364
Phone: (323) 306-4234
Fax: 866-633-0228
tfriedman@toddflaw.com
abacon@toddflaw.com
***Attorneys for Plaintiff***

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID ABITBOL; individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | **CLASS ACTION** |
| vs. | **COMPLAINT FOR VIOLATIONS OF:** |
| SENIOR LIFE SERVICES, INC., and DOES 1 through 10, inclusive, and each of them, | 1. NEGLIGENT VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT [47 U.S.C. §227(b)] |
| Defendant. | 2. WILLFUL VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT [47 U.S.C. §227(b)] |
| | **DEMAND FOR JURY TRIAL** |

Plaintiff DAVID ABITBOL ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon information and belief based upon personal knowledge:

## NATURE OF THE CASE

1.      Plaintiff brings this action individually and on behalf of all others similarly situated seeking damages and any other available legal or equitable remedies resulting from the illegal actions of SENIOR LIFE SERVICES, INC. ("Defendant"), in negligently, knowingly, and/or willfully contacting Plaintiff on Plaintiff's cellular telephone in violation of the Telephone Consumer Protection Act, *47. U.S.C. § 227 et seq*. ("TCPA") and related regulations thereby invading Plaintiff's privacy.

2.      The TCPA was designed to prevent calls like the ones described within this complaint, and to protect the privacy of citizens like Plaintiff. "Voluminous consumer complaints about abuses of telephone technology – for example, computerized calls dispatched to private homes – prompted Congress to pass the TCPA." *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 744 (2012).

3.      In enacting the TCPA, Congress intended to give consumers a choice as to how creditors and telemarketers may call them, and made specific findings that "[t]echnologies that might allow consumers to avoid receiving such calls are not universally available, are costly, are unlikely to be enforced, or place an inordinate burden on the consumer. TCPA, Pub.L. No. 102–243, § 11. Toward this end, Congress found that

> "[b]anning such automated or prerecorded telephone calls
> to the home, except when the receiving party consents to
> receiving the call or when such calls are necessary in an
> emergency situation affecting the health and safety of the
> consumer, is the only effective means of protecting
> telephone consumers from this nuisance and privacy
> invasion."

*Id*. at § 12; see also *Martin v. Leading Edge Recovery Solutions, LLC*, 2012 WL 3292838, at* 4 (N.D.Ill. Aug. 10, 2012) (citing Congressional findings on TCPA's

purpose).

4.      Congress also specifically found that "the evidence presented to the Congress indicates that automated or prerecorded calls are a nuisance and an invasion of privacy, regardless of the type of call…." *Id*. at §§ 12-13. *See also, Mims*, 132 S. Ct. at 744.

5.      In a recent decision, the Supreme Court interpreted the term "automatic telephone dialing system" and held that "[t]o qualify as an 'automatic telephone dialing system,' a device must have the capacity either to store a telephone number using a random or sequential generator *or* to produce a telephone number using a random or sequential number generator." *Facebook, Inc. v. Duguid*, 141 S.Ct. 1163 (2021) (emphasis added).

6.      In *Duguid*, the Supreme Court provided an example of such systems, stating: "For instance, an autodialer might use a random number generator to determine the order in which to pick phone numbers from a preproduced list. It would then store those numbers to be dialed at a later time." *Id*. at 1171-72 fn. 7.

7.      The Sixth Circuit has recognized a distinction between automated calls placed by a dialing system and fielded by a live agent, and agentless prerecorded voice calls: "Congress drew an explicit distinction between 'automated telephone calls that deliver an artificial or prerecorded voice message' on the one hand and 'calls place by 'live' persons' on the other." *Ashland Hosp. Corp. v. Serv. Employees Int'l Union, Dist. 1199 WV/KY/OH*, 708 F.3d 737,743 (6th Cir. 2013).

8.      Similarly, the FTC has observed that "prerecorded calls are by their very nature one-sided conversations, and if there is no opportunity for consumers to ask questions, offers may not be sufficiently clear for consumers to make informed choices before pressing a button or saying yes to make a purchase." 73 FR 51164-01, 51167 (Aug. 29, 2008).

9.      In the present case, Defendant and its agent utilized both an ATDS to initiate calls to Plaintiff and a prerecorded voice to communicate sales pitch

messages to Plaintiff.  Plaintiff never provided express consent to Defendant prior to Defendant placing the calls to Plaintiff.  As such, both acts (use of ATDS and prerecorded voice calls) give rise to separate claims for violation of the TCPA.

## JURISDICTION & VENUE

10.    Jurisdiction is proper under 28 U.S.C. § 1331 because Plaintiff's claims arise out of federal law, the TCPA.

11.    Venue is proper in the United States District Court for the Central District of California pursuant to 28 U.S.C. § 1391(b)(2) because a substantial portion of the events and omissions giving rise to this action occurred in this District.

## PARTIES

12.    Plaintiff, DAVID ABITBOL ("Plaintiff"), is a natural person residing in California and is a "person" as defined by 47 U.S.C. § 153(39).

13.    Defendant, SENIOR LIFE SERVICES, INC. ("Defendant") is a final expense insurance provider and is a "person" as defined by 47 U.S.C. § 153(39).

14.    The above-named Defendant, and its subsidiaries and agents, are collectively referred to as "Defendants."  The true names and capacities of the Defendants sued herein as DOE DEFENDANTS 1 through 10, inclusive, are currently unknown to Plaintiff, who therefore sues such Defendants by fictitious names.  Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein.  Plaintiff will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

15.    Plaintiff is informed and believes that at all relevant times, each and every Defendant was acting as an agent and/or employee of each of the other Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Defendants. Plaintiff is informed and believes that each of the acts and/or omissions complained

of herein was made known to, and ratified by, each of the other Defendants.

## COMMON FACTUAL ALLEGATIONS

### A. Defendant's Business Platform and Practices

16.    Defendant's business practices include making thousands of autodialed telemarketing calls to potential customers every day in order to inquire whether the consumer is interested in need of life insurance, check the accuracy of their contact information, and determine whether the consumer is interested in speaking with an agent about their insurance needs.

17.    One of the methods Defendant uses to generate potential customers is through the utilization of Internet marketing. Defendant owns and operates various websites that are devoted to offering insurance quotes for specific types of life insurance that they offer consumers who search for over the Internet.

18.    Upon information and belief, Defendant also engages and works with third-party call centers to contact consumers who never inquired about insurance through *any* medium. In one instance, a third party, utilizing a sophisticated automated voice response system, contacts consumers and attempts to illicit a positive response from each when the computer asks whether that individual is interested in receiving information about insurance. The computer then immediately forwards the caller's information as a positive hit to Defendant, who then places a subsequent call to that consumer for the purpose of making a sales pitch. Defendant and/or the third parties believe they have circumvented the TCPA and have legal consent to place the calls to these individuals.

19.    The problem is, on information and belief, the call center forwards contact information for any live body who answers the call and communicates with the automated system, regardless of whether that person gave valid consent to receive subsequent marketing calls from Defendant. Furthermore, there is no question the initial calls from the call centers are placed in violation of the TCPA. Therefore, the call centers (agents) are also liable for violating the TCPA, as are

the principals (Defendant).

**B. Defendant's Agents Use Prerecorded Voice Avatar Systems In Conjunction With Predictive Dialers To Robodial Consumers Without Consent**

20.    Defendant contracts with third party companies who are charged with generating potential customers on its behalf.  Some of these third-party lead generators have been identified as culprits for robodialing consumers without prior express consent using a prerecorded voice to solicit Defendant's services in the past.  Defendant is thus aware that 1) often its potential customers are being illegally generated without the requisite level of consent; 2) prerecorded voice technology is being used to do so; and 3) this conduct is inherently risky and intrusive by nature.

21.    Defendant has not put reasonable policies and procedures in place to safeguard consumers from such conduct by its lead generators, and thus has ratified their acts.

22.    Defendant has contracts with lead generators who are acting within the scope of their agency by engaging in the unlawful acts alleged herein.

23.    Reasonable consumers such as and including Plaintiff are recipients of unwanted telemarketing calls as a result of such conduct, and form the reasonable belief that such lead generators are acting on behalf of Defendant, based on the fact that 1) they are calling to inquire about life insurance services; 2) they request personal identifying information during the generation phone calls; 3) they provide that personal identifying information to Defendant; and 4) Defendant utilizes that personal identifying information thereafter to further contact the consumer and follow up.  Based on this, a consumer would reasonably believe that the vendor was acting within the scope of their agency with Defendant, and thereafter providing their information to Defendant, i.e. sharing systems and processes with one another.  Such belief is premised, in part, based on a

manifestation of activity engaged in by Defendant.

24.    On these bases, Plaintiff alleges that Defendant is vicariously liable, under a theory of direct agency, apparent authority, and/or ratification, for the conduct of its third-party lead generation vendors.

25.    Such vendors place calls using a predictive dialer, which is hooked to an avatar system.

26.    A spreadsheet or text delimited file is loaded into a robodialing platform, which is programmed in advance to engage in automated predictive dialing campaigns.

27.    The predictive dialer uses a random or sequential number generator to index and parse the telephone number data, in order to store it in temporary cache ram memory.  A random or sequential number generator is then used to produce the stored telephone numbers from storage to the dialing platform for purposes. The dialing platform is preprogrammed to dial at  specific rate, time, and interval, using algorithmic dialing systems, to maximize the efficiency of the system in reaching as many consumers who pick up calls as possible. These calls are happening in the background of the system, with only a percentage of them resulting in a live person picking up.

28.    When a live person picks up, the system transfers the call to an available agent, who uses an avatar soundboard to play prerecorded messages to the consumer, in order to ask prequalifying questions to the consumer.  These preapproval questions are based on criteria set by Defendant, in order to narrow the potential customers down to prospective purchasers of Defendant's services.  As a crude illustration, for every 1,000 consumers who are dialed, 100 may pick up the call, 50 may stay on the line long enough to speak with an agent, and ultimately 5 may run through the prequalifying questions asked by the avatar system.  Those five will then have their personal identifying information, along with some information regarding their vehicle, and answers to the avatar questions, provided

to Defendant, so that Defendant's agents can follow up on that prospective lead for further sales efforts.

29.    The system used by the lead generator under the agency principles described above are placed on behalf of Defendant and utilize both an ATDS and prerecorded voice.  They utilize a form of automated predictive dialing using campaigns, which rely on a random or sequential number generator to both store and dial the telephone numbers.  The coding for such predictive dialing platforms will be described in greater detail below, but Plaintiff alleges this on information and belief, based on counsel's discussions with software engineers who have reviewed examples of dialer code, and understandings that this type of programming and functionality would be utilized in most predictive dialing platforms.

30.    The capacity of Defendant's platform to use random or sequential number generators to store or produce telephone numbers will be confirmed or refuted based on the code.  Plaintiff alleges that such code exists in the dialing platform used by Defendant.

*i.    The Predictive Dialer*

31.    The following is the FCC's description of a predictive dialer:

"A predictive dialer is an automated dialing system that uses a complex set of algorithms to automatically dial consumers' telephone numbers in a manner that "predicts" the time when a consumer will answer the phone and a telemarketer will be available to take the call. Such software programs are set up in order to minimize the amount of downtime for a telemarketer. In some instances, a consumer answers the phone only to hear "dead air" because no telemarketer is free to take the call…A predictive dialer is equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers.  Predictive dialers initiate phone calls while

telemarketers are talking to other consumers and frequently disconnect those calls when a telemarketer is unavailable to take the next call…Predictive dialers reduce the amount of down time for sales agents, as consumers are more likely to be on the line when the telemarketer completes a call."

*In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd. 14014, 14115 ¶¶ 8 fn 31, 131, and 146 (2003) ("2003 FCC Order").

32.     The following is a description, in plain English, of a predictive dialer typically operates: A dialer operator accesses a database of consumer contact information, which is typically contained in a text delimited file, either in a CSV file, text file, Microsoft Excel, or Microsoft Access file. In essence, this is a spreadsheet, containing rows and columns of data, which includes telephone numbers. The operator will load this data set into the dialing platform. The dialing system will cut the data set into individual lines, unique to each telephone number with an assigned row using a parser. Parsers will separate the data, and then index the telephone numbers using either random or sequential number generators, but most commonly sequential number generators. The program will then store the telephone number using that number generator. The data is stored in temporary cache or RAM memory, to be accessed by the dialer platform thereafter. A random or sequential number generator is programmed to select and produce, automatically, without any organic triggering event by a human being, the telephone numbers, i.e. in accessing them from storage. Once the number generator corresponds to a matching number in the stored list, that telephone number will be "produced" from storage to the dialer, which then automatically dials that telephone number. Thus, predictive dialers have the capacity to use random or sequential number generators to both store and produce the telephone number to be automatically dialed by the dialing program, without human intervention.

33.    To illustrate this using a real-world example that was provided to undersigned counsel by a software engineer who is fluent in Java and has reviewed dialer code, imagine a list of numbers as a lengthy sheet of lined notebook paper. A parser cuts this into strips, and stores it in a paper tray, which is attached to a scanner. Each strip of paper has a row number, and a telephone number. The scanner uses a program to generate numbers, either sequentially or randomly. That generator is hooked to the paper feed, which instructs the scanner to match the generated number, to the corresponding strip of paper in the tray, and then scan that telephone number from the stored list, through the scanner, and out the other side, at which time the scanner is dialing the telephone number on that strip of paper. Now imagine a scanner that accomplishes this with a tray containing thousands of pages of paper in the blink of an eye. Once the tray is empty, the dialing campaign is complete.

34.    The program for dialing campaigns can be pre-set like a sprinkler timer to dial the phone numbers at pre-set intervals and pre-set time periods, based on how many available agents there are expected to receive calls. This is done by way of yet another algorithm that is programmed to "predict" how long an average call with a consumer takes, and dial only a certain volume of phone numbers per time interval, so as to attempt to reach the highest possible volume of consumers, without reaching so many consumers that the "abandonment rate" exceeds regulatory limits set forth by the FCC. In crude terms, imagine a call center with 100 agents, a 10% chance that a call will be answered, and an average call length of one minute. The predictive dialer will "predict" that it should place 1,000 calls per minute, because 100 of those calls will be answered, and so 100 agents will be available to speak with the consumer. Once those agents get off the line, calls will already be automatically happening in the background from the autodialer's random and sequential number generator described above, and agents will be connected with callers who pick up the line. This process is sometimes referred to

as algorithmic dialing.

35.    Due to natural statistical variation, sometimes calls will last longer than a minute, and there will be no available agent right away.  This results in dead air at the beginning of such calls, or abandoned calls.  The percentage of such calls that are picked up and result in dead air, is referred to as the "abandonment rate" and is regulated by the FCC, because it is incredibly annoying to pick up the line and be greeted with silence.  This was heavily discussed during the congressional hearings as highly problematic in 1991 during the TCPA hearings.  In other words, this is not new technology.  It is the same technology Congress was trying to regulate when it enacted the TCPA.  It is the same technology that has been subject to FCC regulations for decades.

36.    Plaintiff alleges on information and belief that Defendant's system has predictive dialing capacity substantively similar to the illustrations described herein, and therefore has the capacity to store and produce telephone number using a random or sequential number generator.

### ii.    The Radom/Sequential Number Generator

37.    Undersigned counsel have studied the code used to program predictive dialers and other similarly-functioning autodialers in the past, with the assistance of software engineers fluent in Java, and have found that such autodialers, when used in automated mode, execute code that relies upon random or sequential number generation to both store and produce numbers to be dialed by the dialer.  For instance, a common "parser" used in SMS blasters and predictive dialing coding integrates the following open-source Apache code into an autodialing dialing platform:

```
730        if (!this.recordList.isEmpty()) {
731            this.recordNumber++;
732            final String comment = sb == null ? null : sb.toString();
733            result=newCSVRecord(this,this.recordList.toArray(Constants.E
```

MPTY_STRING_ARRAY), comment,

734          this.recordNumber, startCharPosition);

735      }

736      return result;

737   }

38.    These lines of code, and specifically the "++" in line 731, represent an operator token that generates sequential numbers as part of a loop. This loop is used to select which number from the CSV file, will be dialed, and produce that number to the dialer using a CSV parser. Such programs can dial thousands of consumers in mere seconds, without any human intervention whatsoever, based on whatever abandonment rate is targeted by the operator of the dialing platform. The sequential number generator in the code above is executed in the process of mass predictive dialing. The program cannot function, and therefore cannot dial any phone numbers at all, without this sequential number generator.

39.    Plaintiff alleges that Defendant used a predictive dialing system with the similar capacity to autodial numbers as shown above. Functionally, that is simply how predictive dialers work. They rely on random or sequential number generators to instruct the data set to produce telephone numbers to the dialer. Without this key component, a dialing campaign would require an agent to manually place the call, through organic decision making, or as was the case in *Duguid v. Facebook*, through some other organic one-to-one triggering event that instructs the dialer to place the call.

40.    Plaintiff will not be able to demonstrate whether the code for Defendant's dialing system contains such random or sequential number generators without doing discovery and obtaining the code for the dialing platform. Plaintiff makes these allegations on information and belief based on the volume of calls he received, the fact that there was a pause at the beginning of the calls, and the fact that the calls were spoofed, which are all indicia that they were autodialed with a

predictive dialer.

41.    The problem with these known realities is that because Plaintiff does not and could not ever have access to Defendant's proprietary code, which is in its sole possession, Plaintiff cannot allege with any more specificity that the system's code contains such language.  However, based on detailed discussions with experts and years of litigation and expertise surrounding such technology, Plaintiff, and his counsel, have a legitimate and sufficient good faith basis to make these allegations, and assert that if the system is a traditional predictive dialer as alleged, *then it will have some variation on the coding that is described herein*, which will undoubtedly include either random or sequential number generators that are being executed in conjunction with storing and dialing the telephone numbers, including the dialing of Plaintiff's phone number.

42.    In Defendant's overzealous attempt to market its services, it placed (and continues to place) phone calls via ATDS and prerecorded voice calls to consumers who never provided consent to call and to consumers having no relationship with Defendant.

43.    Defendant knowingly made (and continues to make) these telemarketing calls via ATDS and prerecorded voice calls without the prior express written consent of the call recipients. As such, Defendant not only invaded the personal privacy of Plaintiff and members of the putative Class, but also intentionally and repeatedly violated the TCPA.

## FACTS SPECIFIC TO PLAINTIFF

44.    Plaintiff is the regular carrier and exclusive user of the telephone assigned the number ending in -6443. The number is assigned to a cellular telephone service for which Plaintiff is charged for incoming calls pursuant to 47 U.S.C. § 227(b)(1).

45.    Plaintiff has never had a business relationship with Defendant.

46.    Plaintiff never provided Defendant with prior express consent to

contact him on his phone via a telephone call.

47.    Plaintiff's telephone number ending in -6443 has been on the national Do Not Call list since on or about February 18, 2020.

48.    Nonetheless, Defendant and its agents called Plaintiff multiple times on his cell phone, attempting to sell Plaintiff life insurance after this date.

49.    On or about January 16, 2021, Defendant placed an automatically dialed call to Plaintiff with the caller ID of 619-745-5296. Plaintiff answered the call several times before hearing a click and hearing a live representative of Defendant begin speaking. Defendant's representative informed Plaintiff that he would like to ask the Plaintiff some questions and get Plaintiff in contact with another representative. Plaintiff ended the call.

50.    On or about January 18, 2021, Defendant placed an automatically dialed call to Plaintiff with the caller ID of 209-257-3266. Plaintiff answered the call several times before hearing a click and hearing a live representative of Defendant begin speaking. The Defendant's representative asked Plaintiff about his age and the identity of his beneficiary, then informed Plaintiff that another representative would call later.

51.    On or about February 3, 2021, Defendant placed a live call to Plaintiff with the caller ID of 772-321-9595. Plaintiff spoke to a representative who informed him that she was calling on behalf of Defendant and that she would send Plaintiff an email to follow up.

52.    On or about February 3, 2021, Defendant placed a live call to Plaintiff with the caller ID of 772-321-9595. Plaintiff spoke to a representative of Defendant named Krystal (surname unknown). Plaintiff asked Krystal for an email address in an effort to determine who was calling him.

53.    Plaintiff suffered a concrete and particularized injury in fact as a result of the unsolicited telemarketing calls he received. The calls invaded Plaintiff's privacy, causing annoyance, wasting his time, consuming use of his smartphone

device without authorization, and otherwise invading his privacy and intruding into his personal affairs without permission. The telemarketing calls also constituted a form of the precise harm that Congress was attempting to prohibit with the TCPA, which was designed to remedy known tortious acts including invasions of privacy and nuisances caused to Americans by automated telemarketing calls placed without consent. Plaintiff actually suffered this precise injury by receiving the unwanted telephone calls, and having his privacy so invaded through a disturbance of his solitude, and unwanted intrusion of his technology and personal space. Accordingly, Plaintiff has Article III standing to seek redress for these violations in Federal Court.

54.    The calls Defendant made to Plaintiff invaded Plaintiff's privacy and violated 47 U.S.C. § 227(b)-(c).

55.    Plaintiff has reason to believe Defendant has called, and continues to call, thousands of wireless telephone customers to market its products and services without consent required by the TCPA.

56.    In order to redress injuries caused by Defendant's violations of the TCPA, Plaintiff, on behalf of himself and a class of similarly situated individuals, brings suit under the TCPA, 47 U.S.C. § 227, *et seq*., which prohibits certain unsolicited calls to cell phones.

57.    On behalf of the Class, Plaintiff seeks an injunction requiring Defendant to cease all wireless telemarketing and spam activities and an award of statutory damages to the class members, together with costs and reasonable attorneys' fees.

## **CLASS ALLEGATIONS**

58.    Plaintiff brings this action individually and on behalf of all others similarly situated, as a member of the proposed classes (together, "Classes"), defined as follows:

ATDS Class:

> All persons within the United States who received any solicitation/telemarketing telephone calls made by or on behalf of Defendant to said person's cellular telephone made through the use of any automatic telephone dialing system and/or an artificial or prerecorded voice and such person had not previously consented to receiving such calls within the four years prior to the filing of this Complaint through the date of class certification.

Sold Lead Subclass:

> All persons within the United States who received any solicitation/telemarketing telephone calls made by or on behalf of Defendant, to said person's cellular telephone made through the use of any automatic telephone dialing system and/or an artificial or prerecorded voice and such person had not previously consented to receiving such calls, and who were called directly by Defendant after their information was transferred to Defendant by the same third party lead vendor as was the case for Plaintiff, within the four years prior to the filing of this Complaint through the date of class certification.

DNC Class:

> All persons within the United States whose telephone numbers were registered on the National Do-Not-Call Registry for at least 30 days, who had not granted Defendant prior express consent nor had a prior established business relationship with Defendant, or who had revoked such consent or prior established business relationship, who received more than one call made by or on behalf of Defendant that promoted Defendant's products or services, within any 12-month period, within the four years prior to the filing of this Complaint through the date of class certification.

---

CLASS ACTION COMPLAINT

59.    Plaintiff represents, and is a member of, The ATDS Class, consisting of all persons within the United States who received any solicitation/telemarketing telephone calls from Defendant to said person's cellular telephone made through the use of any automatic telephone dialing system or an artificial or prerecorded voice and such person had not previously not provided their cellular telephone number to Defendant within the four years prior to the filing of this Complaint through the date of class certification.

60.    Plaintiff represents, and is a member of, the DNC Class, consisting of all persons within the United States whose telephone numbers were registered on the National Do-Not-Call Registry for at least 30 days, who had not granted Defendant prior express consent nor had a prior established business relationship with Defendant, or who had revoked such consent or prior established business relationship, who received more than one call made by or on behalf of Defendant that promoted Defendant's products or services, within any 12-month period, within the four years prior to the filing of this Complaint through the date of class certification.

61.    Defendant, its employees and agents are excluded from The Classes. Plaintiff does not know the number of members in The Classes, but believes the Classes' members number in the thousands, if not more.  Thus, this matter should be certified as a Class Action to assist in the expeditious litigation of the matter.

62.    The Classes are so numerous that the individual joinder of all class members is impractical.  While the exact number and identities of The Classes' members are unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff is informed and believes and thereon alleges that The Classes include thousands of members.  Plaintiff alleges that The Classes' members may be ascertained by the records maintained by Defendant.

63.    Plaintiff and members of the ATDS Class were harmed by the acts of Defendant in at least the following ways: Defendant illegally contacted Plaintiff

and ATDS Class members via their cellular telephones thereby causing Plaintiff and ATDS Class members to incur certain charges or reduced telephone time for which Plaintiff and the ATDS Class members had previously paid by having to retrieve or administer messages left by Defendant during those illegal calls, and invading the privacy of said Plaintiff and the ATDS Class members.

64.    Common questions of fact and law exist as to all members of the ATDS Class which predominate over any questions affecting only individual members of the ATDS Class.  These common legal and factual questions, which do not vary between ATDS Class members, and which may be determined without reference to the individual circumstances of any ATDS Class members, include, but are not limited to, the following:

a.    Whether, within the four years prior to the filing of this Complaint through the date of class certification, Defendant made any telemarketing/solicitation call (other than a call made for emergency purposes or made with the prior express consent of the called party) to the ATDS Class members using any automatic telephone dialing system or any artificial or prerecorded voice to any telephone number assigned to a cellular telephone service;

b.    Whether Plaintiff and the ATDS Class members were damaged thereby, and the extent of damages for such violation; and

c.    Whether Defendant should be enjoined from engaging in such conduct in the future.

65.    As a person that received numerous telemarketing/solicitation calls from Defendant using an automatic telephone dialing system or an artificial or prerecorded voice, without Plaintiff's prior express consent, Plaintiff is asserting claims that are typical of the ATDS Class.

66.    Plaintiff and members of the DNC Class were harmed by the acts of

Defendant in at least the following ways: Defendant illegally contacted Plaintiff and DNC Class members via their cellular telephones thereby causing Plaintiff and DNC Class members to incur certain charges or reduced telephone time for which Plaintiff and the DNC Class members had previously paid by having to retrieve or administer messages left by Defendant during those illegal calls, and invading the privacy of said Plaintiff and the DNC Class members.

67.    Common questions of fact and law exist as to all members of the DNC Class which predominate over any questions affecting only individual members of the DNC Class.  These common legal and factual questions, which do not vary between DNC Class members, and which may be determined without reference to the individual circumstances of any DNC Class members, include, but are not limited to, the following:

a.    Whether, within the four years prior to the filing of this Complaint through the date of class certification, Defendant made any calls to the DNC Class members whose telephone numbers had been registered on the national Do Not Call Registry for over thirty days;

b.    Whether Plaintiff and the DNC Class members were damaged thereby, and the extent of damages for such violation; and

c.    Whether Defendant should be enjoined from engaging in such conduct in the future.

68.    As a person that received numerous telemarketing/solicitation calls from Defendant more than thirty days after he had registered his telephone number with the National Do Not Call registry, Plaintiff is asserting claims that are typical of the DNC Class.

69.    Plaintiff will fairly and adequately protect the interests of the members of The Classes.  Plaintiff has retained attorneys experienced in the prosecution of class actions.

70.    A class action is superior to other available methods of fair and efficient adjudication of this controversy, since individual litigation of the claims of all Class members is impracticable.  Even if every member could afford individual litigation, the court system could not.  It would be unduly burdensome to the courts in which individual litigation of numerous issues would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same complex factual issues.  By contrast, the conduct of this action as a class action presents fewer management difficulties, conserves the resources of the parties and of the court system, and protects the rights of each Class member.

71.    The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of the other Class members not parties to such adjudications or that would substantially impair or impede the ability of such non-party Class members to protect their interests.

72.    Defendant has acted or refused to act in respects generally applicable to The Classes, thereby making appropriate final and injunctive relief with regard to the Classes as a whole.

## **FIRST CAUSE OF ACTION**

**Negligent Violations of the Telephone Consumer Protection Act**

**47 U.S.C. § 227(b)**

**On Behalf of The ATDS Class and Sold Lead Subclass**

73.    Plaintiff repeats and incorporates by reference into this cause of action the allegations set forth above at Paragraphs 1-72.

74.    The foregoing acts and omissions of Defendant constitute numerous and multiple negligent violations of the TCPA, including but not limited to each and every one of the above cited provisions of 47 U.S.C. § 227(b), and in particular

47 U.S.C. § 227(b)(1)(A).

75.    As a result of Defendant's negligent violations of 47 U.S.C. § 227(b), Plaintiff and the ATDS Class Members are entitled to an award of $500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).

76.    Plaintiff and The ATDS Class members are also entitled to and seek injunctive relief prohibiting such conduct in the future.

**SECOND CAUSE OF ACTION**

**Knowing/Willful Violations of the Telephone Consumer Protection Act**

**47 U.S.C. § 227(b)**

**On Behalf of The ATDS Class and Sold Lead Subclass**

77.    Plaintiff repeats and incorporates by reference into this cause of action the allegations set forth above at Paragraphs 1-72.

78.    The foregoing acts and omissions of Defendant constitute numerous and multiple knowing and/or willful violations of the TCPA, including but not limited to each and every one of the above cited provisions of 47 U.S.C. § 227(b), and in particular 47 U.S.C. § 227(b)(1)(A).

79.    As a result of Defendant's knowing and/or willful violations of 47 U.S.C. § 227(b), Plaintiff and the ATDS Class members are entitled to an award of $1,500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

80.    Plaintiff and the ATDS Class members are also entitled to and seek injunctive relief prohibiting such conduct in the future.

**THIRD CAUSE OF ACTION**

**Negligent Violations of the Telephone Consumer Protection Act**

**47 U.S.C. § 227(c)**

**On Behalf of The DNC Class**

81.    Plaintiff repeats and incorporates by reference into this cause of action

1    the allegations set forth above at Paragraphs 1-72.

2        82.    The foregoing acts and omissions of Defendant constitute numerous

3    and multiple negligent violations of the TCPA, including but not limited to each

4    and every one of the above cited provisions of 47 U.S.C. § 227(c).

5        83.    As a result of Defendant's negligent violations of 47 U.S.C. § 227(c),

6    Plaintiff and the DNC Class Members are entitled to an award of $500.00 in

7    statutory damages, for each and every violation, pursuant to 47 U.S.C. §

8    227(c)(5)(B).

9        84.    Plaintiff and The DNC Class members are also entitled to and seek

10   injunctive relief prohibiting such conduct in the future.

11                    **FOURTH CAUSE OF ACTION**

12   **Knowing/Willful Violations of the Telephone Consumer Protection Act**

13                        **47 U.S.C. § 227(c)**

14                    **On Behalf of The DNC Class**

15       85.    Plaintiff repeats and incorporates by reference into this cause of action

16   the allegations set forth above at Paragraphs 1-72.

17       86.    The foregoing acts and omissions of Defendant constitute numerous

18   and multiple knowing and willful violations of the TCPA, including but not limited

19   to each and every one of the above cited provisions of 47 U.S.C. § 227(c).

20       87.    As a result of Defendant's knowing and willful violations of 47 U.S.C.

21   § 227(c), Plaintiff and the DNC Class Members are entitled to an award of

22   $1,500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C.

23   § 227(c)(5)(C).

24       88.    Plaintiff and The DNC Class members are also entitled to and seek

25   injunctive relief prohibiting such conduct in the future.

26                       **PRAYER FOR RELIEF**

27   WHEREFORE, Plaintiff requests judgment against Defendant for the following:

28

## FIRST CAUSE OF ACTION

**Negligent Violations of the Telephone Consumer Protection Act**

**47 U.S.C. § 227(b)**

- As a result of Defendant's negligent violations of 47 U.S.C. § 227(b)(1), Plaintiff and the ATDS Class and Sold Lead Subclass members are entitled to and request $500 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B).
- Injunctive relief prohibiting such conduct in the future.
- Any and all other relief that the Court deems just and proper.

## SECOND CAUSE OF ACTION

**Knowing/Willful Violations of the Telephone Consumer Protection Act**

**47 U.S.C. § 227(b)**

- As a result of Defendant's willful and/or knowing violations of 47 U.S.C. § 227(b)(1), Plaintiff and the ATDS Class and Sold Lead Subclass members are entitled to and request treble damages, as provided by statute, up to $1,500, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).
- Injunctive relief prohibiting such conduct in the future.
- Any and all other relief that the Court deems just and proper.

## THIRD CAUSE OF ACTION

**Negligent Violations of the Telephone Consumer Protection Act**

**47 U.S.C. § 227(c)**

- As a result of Defendant's negligent violations of 47 U.S.C. § 227(c), Plaintiff and the DNC Class members are entitled to and request $500 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(c)(5)(B).
- Injunctive relief prohibiting such conduct in the future.
- Any and all other relief that the Court deems just and proper.

# FOURTH CAUSE OF ACTION

## Knowing/Willful Violations of the Telephone Consumer Protection Act

## 47 U.S.C. § 227(c)

- As a result of Defendant's willful and/or knowing violations of 47 U.S.C. § 227(c), Plaintiff and the DNC Class members are entitled to and request treble damages, as provided by statute, up to $1,500, for each and every violation, pursuant to 47 U.S.C. § 227(c)(5)(B) and 47 U.S.C. § 227(c)(5)(C).
- Injunctive relief prohibiting such conduct in the future.
- Any and all other relief that the Court deems just and proper.

## JURY DEMAND

89.    Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

Respectfully Submitted on August 1, 2023

LAW OFFICES OF TODD M. FRIEDMAN, P.C.

By:   /s/ Todd M. Friedman
       Todd M. Friedman
       Law Offices of Todd M. Friedman
       Attorney for Plaintiff